757 S.E.2d 560

**Martha GOODWYN, Respondent,**

**v.**

**SHADOWSTONE MEDIA, INC. and Robert Pachaly, Appellants.**

**Appellate Case No. 2012–212705.**

**No. 5220.**

Court of Appeals of South Carolina.

April 16, 2014.

Brian Pratt Robinson, Bruner Powell Wall & Mullins, LLC, of Columbia, for Appellants.

Thomas Jefferson Goodwyn, Jr., Goodwyn Law Firm, LLC, of Columbia, for Respondent.

FEW, C.J.

Martha Goodwyn brought suit against her former employer Robert Pachaly and his company Shadowstone Media, Inc., alleging violations of the Payment of Wages Act, S.C.Code

Ann. §§ 41–10–10 to –110 (Supp.2013). After the jury returned a verdict for Goodwyn, the trial court granted her motion for treble damages and attorney's fees under subsection 41–10–80(C) of the Act. We reverse this decision because there was a bona fide dispute as to Goodwyn's entitlement to unpaid wages.

## I. Facts and Procedural History

In April 2009, Goodwyn accepted a sales position with Shadowstone Media selling advertising space in a coupon book that was to be distributed to the public. After working five months, Goodwyn received a total of $1,298 from seven paychecks paid bi-monthly from May 15 to July 31, 2009. She also earned a total of $404 in commissions from ten sales. However, Goodwyn sent Pachaly a resignation letter in September 2009, claiming she was "forced to resign" because she "ha[d] not been getting paid per [their] agreement at the time of [her] hire." In the letter, she requested back pay in the amount of $8,694. Goodwyn subsequently brought suit against Shadowstone Media and Pachaly for breach of contract and violation of the Payment of Wages Act.

At trial, Goodwyn testified that during her interview for the sales position, she told Pachaly she "had two kids that were in daycare" and needed to earn at least $300 per week to cover the cost of daycare. According to Goodwyn, Pachaly agreed to pay her a salary of $300 a week plus commissions earned on sales. Although Pachaly recalled Goodwyn mentioning that "she had to clear [$300] on a weekly basis," he denied offering to pay her a fixed amount per week. Instead, Pachaly testified, "Initially, all the people that were working sales were placed on a commission basis," and Goodwyn "had the same as everybody else in the beginning." Pachaly relied on the terms of a "hiring letter," which he claimed he "handed" to Goodwyn in the office soon after she began working and also mailed to her. The letter stated her compensation was "based on commissions earned from the [sale] of the [advertising space in the coupon books]." Goodwyn denied ever receiving the hiring letter.

According to Pachaly, this commission-based pay arrangement changed after Goodwyn approached him sometime in

May asking for a "draw" of $300 against her commissions. Pachaly told her he "could probably work something out" for $250. Pachaly planned for Goodwyn to sell each advertising space in the coupon book for $295 per month, with the goal being to sign up businesses for twelve months of advertising space. He stated, "[B]ased on ... the price we were charging [for advertising space], if she was closing at that rate, that wouldn't have been a problem" for her to draw against her commissions.

Goodwyn, however, was unable to sell the advertising space at the full monthly rate of $295, and instead negotiated sales at reduced rates. She testified she was unaware, at least in the beginning of her employment, that her commissions would be reduced as a result of selling advertising space at a discounted rate. Instead, she believed Pachaly would pay her a full commission of $1,000 per sale at the time she made the sale. Although Goodwyn admitted that around "the end of May, beginning of June," Pachaly told her "he would have to adjust the commissions" due to the reduced sales rates, she claimed they "never talked about a number."

Relying on the terms of the hiring letter, Pachaly disputed Goodwyn's entitlement to full commissions at the time of the sale. Although the letter provided that the standard commission for selling twelve months of advertising space was $1,000, the letter also stated that if "an ad rate is discounted, then the commissions will be reduced accordingly." Consistent with the terms of the hiring letter, Goodwyn's commissions were reduced based on the price at which she sold the advertising space. This reduction in commissions was documented by an exhibit submitted by Pachaly at trial, entitled "Calculation of Commissions Earned," which Goodwyn claimed she first saw after the lawsuit commenced. Pachaly also argued the hiring letter refuted Goodwyn's claim that she was to receive a commission at the time of the sale. According to the letter, employees were to be "paid upon the collection by the company of the ad costs from the accounts," which typically occurred "monthly over a 12 month period." Thus, employees were to receive "one twelfth of the total commission ... each month upon collection of that month's bill from the advertiser."

Pachaly never printed any coupon books and "thr[e]w in the towel on ... the [coupon] book idea" in August 2009. In September, Goodwyn sent Pachaly a letter that stated she was "forced to resign" because she had been paid "less than $1,500 despite [Pachaly] agreeing to pay [her] a $300 per week draw plus commission." Although the letter stated Pachaly "began paying [her] something close to the $300/week at first (only $250/week)," she calculated Pachaly owed her $8,694 in back pay—$6,600 in salary, $3,500 in commissions, "less the $1406 [he] already paid [her]." Pachaly testified the amount Goodwyn claimed to be owed "seemed a little preposterous" because Shadowstone Media collected a total of only "$1200 to $1400 off [her] sales."

During Goodwyn's testimony, she clarified several inconsistencies between the amount she claimed in the resignation letter and the amount she claimed at trial. First, she testified she "misspoke" in using the word "draw" in the letter, as it did not correctly represent "what she and [Pachaly] agreed to." She explained that while "a draw is when you get money up front for future sales," Pachaly agreed to pay her $300 per week in salary on top of any commissions she earned. Second, Goodwyn testified she "guesstimated" in arriving at the commission figure stated in the letter—$3,500—because she had never seen "a scale or anything telling [her] exactly what [her] commission was." Goodwyn claimed she later calculated the correct amount of commissions owed to her–$4,850–by using the Calculation of Commissions Earned document submitted by Pachaly. She reached this total by adding the figures from the column "Full Commission," which showed the amount Goodwyn would have earned had each client paid for a year of advertising space. Pachaly asserted the correct amount of commissions due was $404, which is the total from the "Commissions Earned" column. Goodwyn testified she was entitled to full commissions for all her sales because "it was by no fault of [her] own that [the clients] didn't pay the rest" of the monthly payments due under their year-long contracts. She explained that had Pachaly printed the coupon books, the clients would have paid the remainder of the monthly amounts because they "were extremely excited about the book."

The jury awarded Goodwyn $3,444 in damages under the Payment of Wages Act, but nothing for breach of contract.

Goodwyn made a post-trial motion pursuant to subsection 41–10–80(C) for treble damages and attorney's fees. The trial court granted the motion, finding "there was not a sufficiently close question of law or fact that would discourage the award of [treble] damages" and attorney's fees.[1]

## II. Existence of a Bona Fide Dispute

■■■ The Payment of Wages Act provides that when an employer fails to pay wages, an employee may recover "an amount equal to three times the full amount of the unpaid wages, plus costs and reasonable attorney's fees as the court may allow." § 41–10–80(C). An award of treble damages and attorney's fees is appropriate only when "there [i]s no good faith wage dispute" because "an employer should not be penalized . . . for failure to pay wages upon assertion of a valid defense to payment." *Rice v. Multimedia, Inc.*, 318 S.C. 95, 98–99, 456 S.E.2d 381, 383 (1995). Thus, the trial court must determine whether "a bona fide dispute" exists as to an employee's entitlement to wages before awarding treble damages or attorney's fees. *Temple v. Tec–Fab, Inc.*, 381 S.C. 597, 600–01, 675 S.E.2d 414, 415–16 (2009). When reviewing such an award, "this court can take its own view of the facts." *Ross v. Ligand Pharm., Inc.*, 371 S.C. 464, 471, 639 S.E.2d 460, 464 (Ct.App.2006); *see also O'Neal v. Intermedical Hosp. of S.C.*, 355 S.C. 499, 509–511, 585 S.E.2d 526, 532 (Ct.App. 2003) (reversing an award of treble damages because, based on the court's review of the record, "a bona fide dispute existed as to whether and to what extent [the employee] was entitled to payment").

■■■ The trial court rejected the argument that the hiring letter created a bona fide dispute concerning Goodwyn's entitlement to wages. The court noted Goodwyn "had never seen [the hiring] letter prior to the taking of her deposition," and found the letter "would not constitute a bona fide good faith defense to the failure to pay wages under the facts of this case." We disagree. It is not merely the existence of the hiring letter that creates a bona fide dispute in this case. Rather, the terms of the letter combined with all the evidence

---

1. Goodwyn's total award amounted to $16,417–$10,322 in treble damages, $4,928 in attorney's fees, and $1,167 in costs.

give rise to a bona fide dispute "as to whether and to what extent [Goodwyn] was entitled to payment" of salary and commissions. *O'Neal,* 355 S.C. at 509–511, 585 S.E.2d at 532.

As to salary, there is evidence to justify Pachaly and Shadowstone Media's defense to payment. The terms of the hiring letter defeat Goodwyn's entitlement to any salary because the letter provided for payment on a commission basis. Goodwyn, however, denied ever receiving this letter, which was contrary to Pachaly's testimony that he "handed" it to her and mailed her a copy. Thus, there was a dispute as to whether Goodwyn knew or accepted the terms of employment contained in the hiring letter. Additionally, there is evidence that sometime in May, the commission-based arrangement set forth in the letter changed when Pachaly agreed to pay Goodwyn a weekly draw of $250. Goodwyn denied agreeing to receive "a draw," but instead contended Pachaly agreed to pay her a weekly salary of $300, plus commissions, during her interview in April. She admitted in her resignation letter, however, that Pachaly "began paying [her] something close to the $300/week at first (only $250/week)." This evidence calls into question Goodwyn's claim that she is owed $6,600 in salary, especially considering the dispute as to whether she agreed to receive draws against her commissions or a salary. Thus, we find a bona fide dispute existed as to whether Goodwyn was entitled to any back payment of salary, and if so, the amount to which she was entitled.

■ As to whether Goodwyn was owed any commissions, the terms of the hiring letter provide Goodwyn was to be "paid upon the collection by the company of the ad costs from the accounts." Pachaly and Shadowstone Media assert their failure to pay is justified because Shadowstone Media "never collected on most of the sale[s]." In response, Goodwyn asserts she expected to be paid commissions "up front" at the time of the sale. "[T]he relevant date for determining whether the employer reasonably withheld wages is the time at which the wages were withheld." *Mathis v. Brown & Brown of S. C., Inc.,* 389 S.C. 299, 316, 698 S.E.2d 773, 782 (2010). If the terms of the hiring letter accurately reflect Goodwyn's pay arrangement, Pachaly was justified in withholding commissions until payment was received.

Moreover, on the facts of this case, the jury's partial award of wages indicates it determined that Pachaly properly withheld a portion of wages to which Goodwyn claimed she was entitled. In *O'Neal*, the employee claimed she was owed $2,541 for accrued time-off upon her discharge. 355 S.C. at 504, 585 S.E.2d at 529. The employer asserted, however, that she was terminated for misconduct, which prohibited payment for accrued time-off under its employment policy. *Id.* The jury found for the employee but awarded her only part of her claimed wages—$1,350. 355 S.C. at 506, 585 S.E.2d at 530. The trial court trebled the jury's award, finding the jury's award of damages indicated it "determined [the employer] did not terminate [her] for cause and thus no good faith basis for refusal to pay benefits was established." 355 S.C. at 506, 509, 585 S.E.2d at 530, 531. The court of appeals reversed, stating a jury's "finding that an employee is entitled to recover unpaid wages is not equivalent to a finding that there existed no bona fide dispute as to the employee's entitlement to those wages." 355 S.C. at 509–11, 585 S.E.2d at 531–32. The court explained the jury awarded the employee "damages equal to payment for only a portion" of what she claimed, which "indicat[ed] the jury determined that [the employer] properly withheld payment for the remaining portion of accrued hours." 355 S.C. at 509, 585 S.E.2d at 532.

In this case, Goodwyn claimed she was entitled to $8,694, but the jury awarded her only $3,444. The jury's award indicates it found Goodwyn was entitled to some, but not all, of the payment she claimed Pachaly withheld. While a jury's partial award of damages does not, by itself, create the existence of a bona fide dispute, we find that under the facts of this case, it indicates Pachaly and Shadowstone Media established a good faith basis for refusal to pay at least a portion of her claimed wages. *See O'Neal*, 355 S.C. at 509, 585 S.E.2d at 532.[2]

---

2. Pachaly and Shadowstone Media also assert they "overpaid" Goodwyn because she earned only $404 in commissions but received draws against these commissions in the amount of $1,298. Although the jury's award of $3,500 indicates it disagreed with this position, its partial award of Goodwyn's claimed damages indicates a bona fide dispute existed as to the extent to which Goodwyn was entitled to wages.

## III.   Conclusion

We find a bona fide dispute existed as to whether and to what extent Goodwyn was entitled to payment.[3]   Therefore, the trial court's award of treble damages and attorney's fees is **REVERSED.**

GEATHERS, J., concurs.

SHORT, J., concurs in result only.

---

**3.**   Given this finding, we decline to address other issues Pachaly and Shadowstone Media raise on appeal.   *See Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (declining to address appellant's remaining issues on appeal when resolution of a prior issue was dispositive).